UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ESTATE OF TAVARIS MCGUIRE, <br> By Constance McGuire, Personal Representative, <br> <br> Plaintiff, <br> <br> v. <br> <br> ROBERT BAKER, in his official and individual Capacity as Chief of Police of the City of Kokomo Police Department, <br> AARON TARRH, Officer #374 in his official and individual capacity, <br> JERAMIE DODD, Officer #380 in his official and individual capacity, and <br> RICHIE SEARS, Officer #368 in his official and individual capacity, <br> <br> Defendants. | Case No. 1:19-cv-00876-TWP-MJD |

**ORDER DENYING DEFENDANTS TARRH'S, DODD'S, AND SEARS' MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY**

This matter is before the Court for ruling on Defendants' Motion for Summary Judgment on the issue of qualified immunity (*see generally* Dkts. 99, 163, 166).  This lawsuit involves the death of 21-year-old Tavaris McGuire ("McGuire"), who died while in police custody. Plaintiff, the Estate of Tavaris McGuire by Constance McGuire, Personal Representative, ("the Estate"), alleges, among other claims, that Defendants Aaron Tarrh ("Officer Tarrh"), Jeramie Dodd ("Officer Dodd"), and Richie Sears ("Officer Sears") (collectively, "the Defendants") violated McGuire's Fourth Amendment rights.[1]  The Defendants request a finding that they are entitled to qualified immunity on the constitutional claims alleged against them.  In resolving this question, the Court considered the parties' briefing at summary judgment, Dkts. 100, 106, 112, on appeal in

---

[1] A state law negligence claim against the Defendants and Robert Baker is also proceeding in this action. (Dkt. 125 at 21-22.)

United States Court of Appeals for the Seventh Circuit Appellate Case Number 21-2586, and their supplemental briefs, Dkts. 167 and 168. For the reasons explained below, material facts in dispute preclude Defendants' motion for qualified immunity on summary judgment.

## I. STANDARD OF REVIEW

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.  FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). The following facts are adopted in part from the Order Granting in Part and Denying In Part Defendants' Motion for Summary Judgment issued July 28, 2021. (Dkt. 125.) Additional facts are drawn from Plaintiff's Statement of the Case presented on appeal (Case No. 21-2586 at Dkt. 21), and Supplemental Brief (Dkt. 167).

On February 3, 2017, McGuire was arrested during a traffic stop in Kokomo, Indiana, with three other men for methamphetamine possession and other related offenses. (Dkt. 100-1 at 1.) At approximately 11:55 p.m. that night, Officer Tarrh stopped a vehicle in which McGuire was the front seat passenger. (Dkt. 100-1 at 1.) Officer Dodd arrived to assist with the traffic stop, (Dkt. 100-2), and Officer Sears arrived later, at approximately 12:18 a.m., to transport McGuire to jail after his arrest, (Dkt. 100-3).

When Officer Tarrh first approached the stopped vehicle, he noticed McGuire appeared nervous and that his hands were shaking. (Dkt. 100-1 at 1.) The driver, Harley Mayhew ("Mayhew"), had a suspended driver's license and one of the other two passengers had an active arrest warrant. *Id.* at 1; Dkt. 102-B at 2:45-6:10 (time marker on video).[2]

At the officer's instruction, everyone exited the vehicle one at a time. *Id.* at 4:37-8:10. Officer Dodd had McGuire exit the vehicle, where he was handcuffed and patted down. *Id.*, 12:23-

---

[2] The Defendants have filed video evidence in support of their Motion for Summary Judgment.  Seven video clips are filed manually at Dkt. 102, a USB flash drive. The video clips are: Ex. B- Officer Tarrh's body camera at arrest; Ex. E- Officer Dodd's body camera at arrest; Ex. F- Jail video garage; Ex. G- Jail video entry sally port; Ex. H- Jail video book-in area; and Ex. R- Officer Tarrh's body camera from arrest to jail. The flash drive also contains an audio file, Ex. I, of the radio call for an ambulance.

13:37; Dkt. 100-2.  The pat down revealed $195.00 in cash and a black cloth zippered pouch, later found to contain 11.6 grams of methamphetamine.  (Dkt. 102-B, 13:27-17:03; Dkt. 100-1 at 1.)

At the scene, McGuire told Officer Dodd he was cold.  (Dkt. 111-7 at 2.)  Officer Dodd zipped up McGuire's coat and asked him if he had a drug problem.  *Id*.  McGuire responded that he did.  *Id.*  McGuire said that he had a methamphetamine problem, that he shot up methamphetamine but did not smoke it, and denied having needles on him.  (Dkt. 100-2; Dkt. 102-E, 0:40-1:09.)  Officer Dodd suggested that he "take this time to dry out." (Dkt. 111-7at 2.)  McGuire walked back to a police vehicle and stood there until he was told to sit on the front fender or hood, which he did.  (Dkt. 102-E, 14:13-16:51.)

At 12:18 a.m., Officer Sears took McGuire to the Howard County Jail (the "Jail").  (Dkt. 100-3.)  During the drive to the Jail, McGuire spoke with Officer Sears and showed no signs of needing medical attention. (Dkt. 100-3.)

When Officer Sears and McGuire arrived at the Jail at 12:24 a.m., McGuire exited the squad car without assistance, walked through the sally port to the jail door, waited at the jail door until it opened, and then walked unassisted into the Jail.  (Dkt. 102-F, 0:55-1:52 (jail garage video); Dkt. 102-G, 1:48-2:44 (jail entry sally port video); Dkt. 102-Ex. H, 2:43-2:46 (jail book-in area video); Dkt. 100-3.)

McGuire was handcuffed and placed in front of a common use desk in the book-in area. (Dkt. 102-Ex. H, 2:33-2:46.)  McGuire was told to sit in a chair while his paperwork was completed, which he did.  *Id.*  Four minutes later, McGuire stood up and approached the book-in counter, as requested, but he did not give his name to Officer Sears.  *Id.*, 6:50-8:43.  McGuire knocked his head on the book-in counter and Officer Sears asked him if he was alright.  *Id.,* 6:58-7:05.  McGuire was told to return to his seat.  *Id*., 8:45-8:54.  McGuire remained in his seat for the

4

next seven and a half minutes until Officer Sears told him to stand up so that he could remove his handcuffs. *Id.*, 8:54-16:30. After the handcuffs were removed, McGuire removed a necklace, jacket, and shoes, and placed them on the counter as directed. *Id.*, 7:14-17:36. McGuire then returned to his seat where he sat calmly for the next 12 minutes, until 12:54 a.m. *Id.*, 17:36-30:45.

McGuire had been arrested before and was known to both Corporal Kenneth Peterson ("Cpl. Peterson") and Sgt. Tony Bougher ("Sgt. Bougher") of the Howard County Sheriff's Department. (Dkt. 111-1; Dkt. 111-2.) He was usually responsive and cooperative when arrested. (Dkt. 111-5 at 3-4; Dkt. 111-4 at 2.) On this occasion, he was not communicating, (Dkt. 111-4 at 3) or making eye contact. (Dkt. 111-4 at 1; Dkt. 111-5 at 14.) Sgt. Bougher asked McGuire what was wrong with him, but he did not respond. (Dkt. 111-5 at 14.) Sgt. Bougher recognized that McGuire was acting differently from other times he had been in the jail:

> Q. What was different about February 3rd from how you had seen him before?
>
> A. He wasn't responding to any questions he was being asked by the other officers.
>
> Q. In the past had he typically been responsive?
>
> A. Yeah. Any time you would ask him something he would respond to you one way or the other.
>
> Q. Was he a person that was fairly cooperative in his responses in the past?
>
> A. I personally never had any issues or problems with him.

(Dkt. 111-5 at 3-4.) Cpl. Peterson noted "Having dealt with Mr. McGuire on previous occasions, this lack of wanting to provide information and the agitated demeanor of McGuire sent warning signals to me." (Dkt. 111-1 at 1.)

At 12:54 a.m., McGuire fanned the front of his shirt back and forth then began to make spastic movements. (Dkt. 102-Ex. H, 30:45-32:33.) Two minutes later, at approximately 12:56 a.m., McGuire removed his shirt and leaned over to get a drink of water. *Id.*, 32:33-32:46.[3]

Jail staff and police officers noticed a change in McGuire's behavior and began asking him what was wrong. *Id.*, 32:47-33:22. Sgt. Bougher observed McGuire "picking things out of the air," and "like he was picking something." (Dkt. 111-2; Dkt. 111-5 at 4.) The Jail staff and police officers spent the next few minutes asking McGuire questions and trying to determine "why he was acting so strangely". (Dkt. 102-Ex. H, 33:22-34:48.)

Cpl. Peterson became concerned that McGuire had ingested methamphetamine. (Dkt. 111-4 at 3-4.) Cpl. Peterson asked what McGuire's charges were and when he learned McGuire was charged with possession of methamphetamine, he considered it a "red flag" in conjunction with his behavior. *Id.* at 4.

Cpl. Peterson and Officer Bougher discussed McGuire's erratic behavior and concluded that McGuire needed to go to the hospital and be cleared medically before being placed in Jail custody. (Dkt. 111-1 at 1.) Cpl. Peterson advised Officers Sears and Dodd that McGuire would

---

[3] The Defendants explain how the timeline of events was calculated: Exhibit H is the audio and video recording of McGuire at the Howard County Jail on February 3 and 4, 2017:

> Exhibit R is Officer Tarrh's body camera that captures the clock on the wall behind Mr. McGuire when Officer Tarrh walked to the counter with the grey bin and turned to look at Mr. McGuire. Comparing that same moment to the time stamp on Exhibit H, shows that the timestamp of 18:46 on Exhibit H is 12:42 a.m. Ex. H shows that Mr. McGuire started fanning his shirt at 30 minutes and 45 seconds into that video on Exhibit H – or 12 minutes after Officer Tarrh walked to the counter with the grey bin and turned to look at Mr. McGuire. Twelve minutes after 12:42 a.m. is 12:54 a.m. This timeline is further corroborated by comparing Exhibit R and Exhibit H. Exhibit R shows that Officer Sears arrived at the police station with Mr. McGuire at 12:24 a.m. Exhibit H shows that Mr. McGuire began fanning his shirt 30 minutes after being in the jail book-in area, or at 12:54 a.m.

(Dkt. 100 at 4, n.3.)

not be booked into the Jail in his condition and that he needed to be medically cleared. *Id.*[4] But Officer Sears went to the restroom before seeking medical treatment. Sgt. Bougher told Officer Dodd that he was not trying to cause any issues, but he could not accept McGuire in his condition. (Dkt. 111-2.) Officer Dodd acknowledged the way McGuire was acting and stated that he "understood." *Id.*

> Sgt. Bougher was asked:
>
> Q. What are the facts upon which you base your conclusion that he [McGuire] needed to be medically cleared?
>
> A. Because he was not acting correctly. He was not acting like [McGuire] normally acted when he was in our facility. He was not responding to any questions that was (sic) being asked.

(Dkt. 111-5 at 13.) Sgt. Bougher was asked if McGuire's behavior appeared delusional. He responded, "It didn't appear right." *Id.* at 14.

At 12:58 a.m. Officer Tarrh gave McGuire his shoes to put on to get ready to go to the hospital. (Dkt. 102-Ex. H, 34:43-34:48.) McGuire did not put on his shoes; he continued to move in an erratic manner that could be described as jerking or seizing. *Id.*, 34:48-35:45.

At approximately 1:00 a.m., Officer Dodd used his police radio to call for an ambulance, reporting that McGuire had an unknown medical issue, possibly a reaction to a narcotic. *Id.*, 35:45-36:07; Dkt. 102-I, 0:00-0:22 (audio of call for ambulance); Dkt. 111-5 at 12. While waiting for the ambulance, Officer Dodd continued questioning McGuire to determine what was wrong. (Dkt. 102-Ex. H, 36:33-37:34.) Officer Dodd asked McGuire if he had taken any drugs or if he had issues with seizures; he then asked Mayhew if he had ever seen McGuire have a similar episode,

---

[4] The Estate originally brought claims against Howard County Sheriff Steve Rogers, Sheriff Deputy Jerry Asher, and Howard County Indiana, (the "Howard County Defendants"). On January 30, 2020, the parties stipulated to the dismissal of the Howard County Defendants. (Dkt. 74.) In a statement of claims, the Estate notes that the Howard County deputies never accepted custody of McGuire at the Jail, and therefore he was in the custody and care of municipal officers at all times material to this action. (Dkt. 76.)

if McGuire had taken anything, and how long Mayhew had been with McGuire that night. *Id.*, 36:33-37:34.

By 1:02 a.m., an ambulance was enroute to the Jail. (Dkt. 100-4 at 4.) The ambulance arrived at the Jail at 1:04 a.m., and emergency medical technicians were with McGuire at 1:08 a.m. *Id.*; Dkt. 101-H, 42:40. Within approximately three minutes, McGuire was secured on a stretcher and then taken into the Jail's garage where the ambulance was parked. *Id.*, 42:45-45:50. Although McGuire appeared conscious, his body, arms and legs were moving about uncontrollably and erratically as he left the Jail and entered the garage. *Id.*, 46:15; Dkt. 102-G, 46:00 (jail entry sally port video). Cpl. Peterson further observed that McGuire was sweating profusely. (Dkt. 111-4 at 8.)

Paramedics provided treatment. (*See* Dkt. 100-4 at 1; Dkt. 100-5 at 7.) They transported McGuire to St. Vincent Kokomo Hospital. (Dkt. 100-5 at 7.) McGuire became unresponsive, was not breathing, and had no cardiac activity. (Dkt. 100-5 at 8.) At 1:54 a.m., Dr. Williams pronounced McGuire dead. (Dkt. 100-5 at 10.)

During the autopsy, a torn piece of a clear plastic baggie containing a large amount of methamphetamine residue was found in the right mid pocket of McGuire's sweatpants, and a fragment of a clear plastic baggie was found in his stomach. (Dkt. 100-8 at 4, 7.) Toxicology tests found McGuire had methamphetamine in his system at the time of his death. (Dkt. 100-12 at 1; Dkt. 100-5 at 2.) McGuire's death was determined to be an accidental amphetamine overdose. (Dkt. 100-8 at 1; Dkt. 100-5 at 2.)

Dr. Julian Ungar-Sargon ("Dr. Ungar-Sargon"), a medical doctor who specializes in neurology and pain management, offers an opinion that the twitching in McGuire's arms and legs should have alerted the officers to a possible seizure and a medical emergency. (Dkt. 100-11 at 3.)

He opines that the Defendants' decision to call for an ambulance rather than transferring McGuire to the emergency room in a police vehicle contributed to a critical delay in McGuire receiving medical intervention while he was actively overdosing. *Id*. Dr. Ungar-Sargon concluded to a reasonable degree of medical certainty that if Defendants had transferred McGuire to the emergency room themselves, he would have received timely resuscitation and lifesaving trauma care that might have saved his life. (Dkt. 100-11 at 3; Dkt. 100-37.)[5]

### III. DISCUSSION

Defendants argue that they are entitled to judgment as a matter of law based on qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*. 137 S.Ct. 548, 551 (2017) (citation omitted) (internal quotation marks omitted). "[T]wo central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (citation omitted).

Once raised, the plaintiff, not the defendant, carries the burden of overcoming the affirmative defense. *Sparing v. Village of Olympia Fields,* 266 F.3d 685, 688 (7th Cir. 2001) (*citing Spiegel v. Cortese*, 196 F. 3d 717 (7th Cir. 1999).

For the reasons explained below, material facts in dispute preclude granting the Defendants qualified immunity on summary judgment.

---

[5] In contrast, the Defendants' expert, Dr. Jason D. May, opined in his report that the movements and actions shown on the video prior to 12:54 a.m. "would not be considered indicative of someone needing medical attention," (Dkt. 100-5 at 14), and "there was no delay in calling medical help for[] McGuire", *id*., and [t]he officers did not disregard [] McGuire's symptoms when his behavior change was noted because they called the ambulance in a timely manner. Calling the ambulance for [] McGuire in this situation was an appropriate thing to do." *Id*. at 16.

9

A. **Fourth Amendment Claim**

McGuire was an arrestee at the time of his death because, although he was in police custody, he had not yet had a probable cause hearing. *Pulera v. Sarzant*, 966 F.3d 540, 548, 550 (7th Cir. 2020). Thus, his constitutional claims alleging inadequate medical care are brought pursuant to the Fourth Amendment and are considered under the objective reasonableness standard. *Id.* at 549 (citing *Currie v. Chhabra*, 464 F.3d 626, 629-30 (7th Cir. 2013)). To succeed under this standard "an arrestee must demonstrate that an official's actions were 'objectively unreasonable under the circumstances'" and caused his injuries. *Id.* at 550 (citing *Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017)). This means that the Estate must show that the Defendants acted purposefully, knowingly, or recklessly when considering the consequences of their handling of McGuire's medical condition. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018) (applying objective unreasonableness inquiry to medical-care claims brought by pretrial detainees under the Fourteenth Amendment). The question at summary judgment is whether "[a] properly instructed jury could find that [defendants] made the decision to continue observing [plaintiff] in the jail, [rather than obtaining emergency medical treatment], with purposeful, knowing, or reckless disregard of the consequences." *Miranda,* 900 F.3d at 354.

The Defendants urge the Court to consider four factors in determining whether each individual Defendant's response to McGuire's presentation was objectively unreasonable. (Dkt. 168 at 2, n1.) These factors include: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). The "'reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with … the scope of the requested treatment.'"

*Pulera*, 966 F.3d at 552 (7th Cir. 2020) (quoting *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). But Defendants do not dispute the second, third, or fourth of these factors; they do not argue that calling an ambulance or taking McGuire to the hospital would have been burdensome or compromised any police interests. Nor is there any dispute that McGuire suffered from a serious medical need—he was overdosing which led to his death. Thus, the only unresolved factor is whether the Defendants were on notice that McGuire had a medical need.

Defendants argue that they are entitled to summary judgment because "[c]onsidering the totality of the circumstances, the individual officers act[ed] reasonably when they called for an ambulance within five minutes of McGuire's change in behavior." (Dkt. 100 at 25.) The Court finds that the question of whether the three officers – Tarrh, Dodd, and Sears – were objectively reasonable in handling McGuire's need for medical treatment is a question of material fact that should be decided by a jury. In particular, there is a material fact in dispute regarding whether a reasonable officer in Defendants' position would have been on notice that McGuire had a medical need requiring emergency intervention. *Ortiz,* 656 F.3d at 530-531.

The Defendants point to *Pulera v. Sarzant*, 966 F.3d 540, 545 (7th Cir. 2020), in support of their view that the Defendants' delay in calling for an ambulance was objectively reasonable. In that case, plaintiff Pulera attempted to kill himself but, fortunately, did not succeed. He sued the officers responding to the suicide attempt because "they wasted seconds waiting for back-up before entering his cell, cutting him down, and calling an ambulance." *Id.* at 556. The Seventh Circuit determined however, that the officers' actions were objectively reasonable explaining:

> Even with the delays Pulera criticizes, it is undisputed that the officers sprang into action, had the pressure off his neck in less than two minutes, and summoned an ambulance in less than five, by which time Summers-Sgroi was already providing emergency treatment. Perhaps the officers could have acted faster, but the Constitution does not demand perfection. [*Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010)]; *see also Florek*, 649 F.3d at 600 ("[T]he Fourth

11

> Amendment reasonableness inquiry necessarily takes into account the sufficiency of the steps that officers did take"). Nor does it demand that a correctional officer enter a potentially dangerous situation before back-up can arrive. *Giles v. Tobeck*, 895 F.3d 510, 514 (7th Cir. 2018) (per curiam). Under the totality of the chaotic circumstances, the officers' swift actions were indisputably reasonable and preclude a finding that they violated Pulera's constitutional rights.

*Pulera v. Sarzant*, 966 F.3d 540, 555–56 (7th Cir. 2020).

*Pulera* is readily distinguishable from this case. As discussed below, a reasonable jury considering the evidence in the light most favorable to McGuire could conclude that each of the Defendants did not act reasonably in waiting as long as they did to call an ambulance because, unlike the defendants in *Pulera*, they did not "spring into action," their delay was not justified because they were tending to other emergent needs, and there was no one present to provide emergency treatment to McGuire before the ambulance was called.

Because "[q]ualified immunity is an individual defense available to each individual defendant in his individual capacity," each Defendant is addressed individually below. *Est. of Williams by Rose v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018).

    1.    **<u>Officer Dodd</u>**

First, Officer Dodd is not entitled to qualified immunity because there are material facts in dispute. Officer Dodd arrested McGuire and testified at his deposition that he assumed McGuire had taken methamphetamine before his arrest because McGuire was in possession of methamphetamine at the time and admitted to having a methamphetamine problem. (Dkt. 111-7 at 2, 3.) Officer Dodd was present in the Jail common area when McGuire began to behave in a manner that a reasonable juror could conclude reflected that he was facing a life-threatening emergency. Officer Dodd asked McGuire what was going on, but McGuire was unable to respond. Officer Dodd's questions suggest that he thought McGuire may be having seizures. He told McGuire to put on his shoes so he could go to the hospital, but McGuire's health had deteriorated

12

to the point that he was unable to comply with that order. Officer Dodd used his police radio to call for an ambulance indicating that McGuire may have ingested a narcotic. (Dkt. 111-4 at 3-4; Dkt. 168 at 7.)

Defendants argue that "Officer Dodd did not deny McGuire medical attention knowing that McGuire was in serious need of medical attention." (Dkt. 168 at 8.) But a reasonable jury could conclude otherwise. Instead of jumping into action based on McGuire's inability to communicate and seizure-like movements, he delayed by observing McGuire and asking questions that McGuire was unable to answer. A reasonable jury could conclude that McGuire's physical symptoms should have put Officer Dodd on notice that he was facing a medical emergency and that he unreasonably delayed calling for an ambulance.

### 2. Officer Sears

Second, a reasonable jury might conclude that Officer Sears violated McGuire's Fourth Amendment rights. At 12:18 a.m., at the conclusion of the traffic stop, Officer Sears took McGuire to the Jail. During the drive, McGuire spoke to Officer Sears and showed no signs of needing medical attention. But by 12:28, when Officer Sears asked McGuire his name, McGuire did not respond. Officer Sears states that McGuire refused to give his name, but a reasonable jury could conclude that McGuire was unable to give his name. McGuire then began to shake and jerk in his seat. By 12:54, McGuire's actions could be understood by a reasonable jury to reflect that he was in significant distress and potentially facing a life threatening medical emergency. Nearly the entire time McGuire was at the Jail, he was sitting directly across and just feet away from Officer Sears. In addition, Jail staff told Officer Sears that McGuire needed to get checked out at the hospital, but Officer Sears said to wait because he needed to use the restroom. (Dkt. 111-1 at 1.)

13

Officer Sears never took any action to obtain emergency medical care for McGuire, instead he watched and waited until Officer Dodd called for an ambulance.

Defendants argue that

> [e]ven when Officer Sears noticed McGuire's change in behaviors, the change was not such that it was clear that McGuire needed medical attention, nor was it clear that McGuire had a serious medical need. Less than four minutes passed between when Officer Sears was first aware of McGuire's change in behaviors and when an ambulance was called. During that time, Officer Sears acted objectively reasonably by observing McGuire while others tried to determine what was going on with McGuire.

(Dkt. 168 at 6.) Again, this argument is based on Defendants' version of the facts. A reasonable juror, however, could watch the video and determine that McGuire's movements were consistent with someone facing a life-threatening medical emergency. A reasonable juror could conclude that Officer Sears knew McGuire was in possession of methamphetamines at the time of his arrest and that Officer Sears should have sought medical treatment well before the ambulance was called based on McGuire's behaviors.

### 3. Officer Tarrh

Third, Officer Tarrh has not established beyond dispute that he did not violate McGuire's Fourth Amendment rights. A reasonable jury could conclude based on Officer Tarrh's presence during the traffic stop that he understood that McGuire had been arrested for possession of methamphetamines. He entered the Jail approximately 16 minutes after McGuire and was present in the common area of the Jail where all relevant events occurred. Officer Tarrh acknowledges observing McGuire at 12:56, (Dkt. 168 at 4), at which time a reasonable jury could conclude that McGuire was facing a life-threatening medical emergency given his inability to communicate and distressed movements. But Tarrh did not take action to provide emergency medical treatment,

instead Tarrh brought McGuire's shoes to him, at a time when McGuire was unable to put them on.

Defendants argue that "Officer Tarrh had no knowledge that McGuire had a medical need, let alone the seriousness of his medical need…. The only information Officer Tarrh had was that McGuire began fidgeting and engaging in unusual behaviors more than an hour after Officer Tarrh initiated the traffic stop." (Dkt. 168 at 4.) Once again, the Defendants' argument is firmly based in their version of the facts. But taking the evidence in the light most favorable to the Estate, a reasonable jury could watch the video and conclude that Officer Tarrh stood by and watched while McGuire suffered a catastrophic medical emergency without taking any action to obtain medical treatment.

This finding that there are material facts in dispute regarding the meaning of McGuire's behavior is supported by the parties' experts who have diametrically opposed opinions on the issue. (*See* Dkt. 100-5 (Dr. May's report) and Dkt. 100-11 (Dr. Ungar-Sargon's report).) The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A jury should decide which, if either, expert's opinion is relevant to the issues in the case and what weight to give the opinion.

For these reasons, the Estate has provided sufficient evidence upon which a jury could conclude that each Defendant deprived McGuire of a constitutional right. The Court then turns to the next question in the qualified immunity analysis which is whether the right at issue was clearly established at the time McGuire was arrested and under the circumstances presented. *See Bianchi*, 818 F.3d at 319.

B.  **An Arrestee's Right to Emergency Medical Care for a Potentially Life-Threatening Condition is Clearly Established**

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly.* 137 S.Ct. 548, 551 (2017) (citation omitted) (internal quotation marks omitted).

The United States Supreme Court has explained:

> A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. ——, ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
>
> "We have repeatedly told courts ... not to define clearly established law at a high level of generality." *al–Kidd, supra,* at 742, 131 S.Ct. 2074. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

*Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015).

Defendants acknowledge that there is a broadly defined right to "care for the serious medical conditions of persons in custody." (Dkt. 100 at 23) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (finding constitution violated when prison guards delay access to medical care)). Defendants argue, however, that "there was no clearly established law that required McGuire to have received medical treatment when there was no indication that treatment was needed." No. 21-2586, Dkt. 27 at 19. To frame the issue this way, however, is to accept the evidence in the light most favorable to Defendants. Equally unpersuasive

16

is Defendants' claim that "the constitutional right at issue here is whether an arrestee has a Fourth Amendment right to medical care at the first indication that he may be experiencing a potential medical issue." (Dkt. 100 at 23.)  This too, misses the mark.

Instead, the evidence taken in the light most favorable to the Estate is that the Defendants knew or should have known that McGuire was potentially experiencing a life-threatening medical event but nonetheless delayed seeking emergency medical treatment or evaluation.  And, at the time of McGuire's death, it was clearly established that "providing no medical care in the face of a serious health risk" violates the Constitution.  *Ortiz v. City of Chicago*, 656 F.3d 523, 538 (7th Cir. 2011) (denying qualified immunity at summary judgment); *See Estate of Perry v. Wenzel*, 872 F.3d 439, 445 (7th Cir. 2017) (denying qualified immunity because since at least 2010, it has been "clearly established that a detainee … was entitled to objectively reasonable medical care and failing to provide any medical care in light of a serious medical need was objectively unreasonable.").  Objectively reasonable medical care requires providing or requesting emergency medical treatment without delay for potentially life-threatening medical conditions.  This was clearly established at the time of McGuire's death.  Given the factual disputes in this case, the Defendants are not entitled to qualified immunity.

## IV. <u>CONCLUSION</u>

The Defendants' motion for summary judgment on their qualified immunity defense is **DENIED**.  The Estate's Fourth Amendment claim against Officers Tarrh, Dodd, and Sears in their individual capacities **shall proceed**. The Estate's Indiana law negligence claims against Robert Baker and Officers Tarrh, Dodd, and Sears, **shall proceed**.

Because the remaining claims will be resolved by settlement or trial, the **Magistrate Judge is requested** to conduct a status conference at his earliest convenience to determine logistical needs

for the trial and to determine whether a settlement conference should be held.  A trial setting will follow by separate order.

**SO ORDERED.**

Date:  11/4/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Caroline Burchett Briggs
BRIGGS LAW OFFICE
carolinebriggslawoffice@yahoo.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com

Chambers of Magistrate Judge Dinsmore